MoIlvaine, J.
Each party traces his title to the cession of territory northwest of the Ohio river by the state of Virginia to the United States in the year 1784 (1 U. S. Laws, 472), whereby lands situate in this state, between Scioto and Little Miami rivers, were devoted to the satisfaction of warrants, as ■bounties, issued by the state of Virginia to troops, for services in the revolutionary war, on the continental establishment.
Flagg, plaintiff below, claims title under the act of congress of April 18, 1871 (16 Stat. at L. 416), which reads as follows: “ Be it enacted by the‘senate and house of representatives of .the United States in congress assembled, that the lands remaining unsurveyed and unsold in the Virginia military district in tthe state of Ohio, be and the same are hereby ceded to the state of Ohio upon the conditions following, to wit: Any person who, at th® time of the passage of this act, is a bona fide settler on any portion of said lands, may hold not exceeding one. hundred and sixty acres so by him occupied, by his pre *169 empting the same in such manner as the legislature of the state of Ohio may direct.”
To complete his chain of title, the plaintiff below claims further under a grant from the state of Ohio to the Ohio Agricultural and Mechanical College, and from the college to himself.
Coan, the defendant below, claims title under an exchange military warrant, No. 494, issued by the state of Yirginia on the 16th day of June, 1840, to the children and heirs of Francis Gordon, a child and heir of John Gordon, the only heir of Thomas Gordon, who was a lieutenant of cavalry in the Continental line of Yirginia troops in the revolutionary war, for five hundred acres of land, to be laid off in one or more surveys : An entry, No. 15,882, purporting to cover five hundred acres of land under the foregoing warrant No. 494, made on December 18, 1849, by the said heirs of Francis Gordon and one David F. Heaton, an assignee of part of said warrant. A survey under said entry, No. 15,882, purporting to contain four hundred acres — three hundred and seventy-five acres for the heirs of Francis Gordon and twenty-five acres for said Heaton — made by said D. F. Heaton, a deputy surveyor of the district, on April 16, 1851, giving the metes'and bounds of the land surveyed, which was duly recorded on December 23, 1851. And mesne conveyances from the heirs of said Francis Gordon and said Heaton to himself.
It appears, however, that this survey, No. 15,882, embraces, in fact, one thousand six hundred and eighty-two acres.
No patent has ever been issued on this entry and survey for the reason, among others, that the quantity of land embraced is grossly in excess of the quantity named in the warrant,. No. 494.
Upon these facts, the main questions in the case arise.
1st. Did the entry and survey invest the owners of the warrant or their assignee, with an equitable interest in the lands surveyed? If, as against the United States, an equitable estate had passed to the defendant below, it may be admitted that the subsequent grant by the United States to the state of Ohio did not divest such estate.
*170 Upon general principles, it cannot bé doubted, that a fraud so palpable, as is shown to have been attempted against the laws of the United States by this eútry and survey, would have avoided the survey entirely. The excess is so great, that no reasonable supposition can arise, that it occurred through an honest mistake.
True, the United States, against whom it was intended, might waive the fraud and relieve the party from its consequences, in whole or in part; and it is claimed that such was the effect of the act of Congress of July 7, 1838 (5 Stat. at L. 262), the second section of which provides: That “ no patent shall be issued ly virtue of the preceding section, for a greater quantity of land than the rank or term of service of the officer or soldier to whom, or to whose heirs or assigns, such warrant has been granted, would have entitled him to under the laws of Virginia and of the United States regulating the issuing of such warrants ; and whenever it appears to the secretary of war that the survey made by any of the aforesaid warrants is for a greater quantity of land than the officer or soldier is entitled to for his services, the secretary of war shall certify on each survey the amount of such surplus quantity, and the officer or soldier, his heirs or assigns, shall have leave to withdraw his survey from the office of the secretary of war, and resurvey his location, excluding such surplus quantity, in one body, from any part of his resurvey, and a patent shall issue upon such resurvey as in other cases,” &e. Clearly, this section forbids the issuing of a patent for a greater quantity of land than the officer or soldier was entitled to under the laws regulating the subject; and by fair construction it would seem that the relief provided was only in cases where the quantity named in the warrant was in excess of the quantity to which the warrantee was entitled, and not to cases where the survey was in excess of the warrant. But however that may be, the operation of the section is expressly limited to cases arising under the preceding section of the act, and the operation of that section expired by its own limitation on the 10th of August, 1840. If it be claimed that the operation of section 2 of this act was extended by reason of the extension *171 and revival of the first section by the act of August 19, 1811 (5 U. S. L. 119), it is, at most, sufficient for this case to say, that the “ preceding section ” thus revived and continued in force for a limited time, contained the sole authority for making and returning entries and surveys, under these Virginia warrants, and since March 3, 1857, there has been no authority for making or returning surveys under any circumstances whatever. So that, at all events, the right to relief against excessive surveys, granted by the second section of' the act of 1838, whatever it may have been, has not existed since 1857, even if it be conceded that it was continued at all after 1810. See statute, March 3, 1855 (10 Stat. at L. 701).
Again, it is claimed that congress has recognized the validity of surveys within the district, notwithstanding the quantity embraced in the survey was excessive, by thq proviso in the act of March 23, 1807 (1 U. S. L. 92), which reads as follows: “Provided, that no locations as aforesaid, within the above-mentioned t'rict, shall, after the passage of this act, be made on tracts of land for which patents had previously issued, or which had been previously surveyed; and any patent which may, nevertheless, be obtained for land located contrary to the provisions of this section, shall be considered as null and void.”
It has undoubtedly been settled by repeated decisions, that under this proviso, that excess in the quantity of land embraced in a survey, does not vitiate the survey so as to authorize a subsequent location or entry under another warrant; but it has not been settled, nor was it the intention of Congress, by this proviso, to require a patent to be issued on an excessive survey. As between locators, lands actually surveyed, whether the survey was fraudulent or not, were withdrawn from subsequent entry and survey until the previous survey should be withdrawn or set aside. This legislation was in the interest of peace, as bettveen locators of warrants, and was a wise provision. But to hold that Congress intended, as against the government of the United States, to declare that excessive surveys, whether by mistake or design, should be binding, so as to establish an equitable.estate in the holder of the warrant, and *172 entitle Mm to a patent for the whole or any part of the survey, would do violence to the language of the jproviso, and would show a disregard for the faithful execution of the trust imposed by the cession of these lands by Virginia to the United States, amounting to wickedness. As far ás we are advised, we know of no rule or practice, based either upon congressional enactment or principles of justice, by which the United States government could be justified in recognizing in the defendant below, an equitable estate in the whole or any part of the lands in dispute, arising upon an entry and survey so palpably fraudulent as those upon which he relies; and, therefore, it was within the ¡Dower of congress, on April 18, 1871, to grant to the state of Ohio the lands in dispute, free from any claim of right or interest therein of the defendant below.
It is claimed, however, that these lands were not conveyed or intended to be conveyed, by the act of April 18, 1871. The following'is the description of the lands intended tobe conveyed by that act, to wit: “ The lands' remaining unsurveyed and unsold in the Virginia military district in the state of Ohio.”
On the part of the plaintiff in error, it is contended that the word “ unsurveyed ” is used in this statute as the counterpart of the word “ surveyed,” as used in the proviso in the act of 1807, which has been construed to mean “surveyed in fact,” whether the survey was valid or voidable in point of law. On the other side, it is contended, that the intention of congress was to grant to the state all the lands remaining in the district of which the United States had the power of disposition, so that the word “unsurveyed” included land covered by an invalid or void survey. This construction is supported strongly by the facts that', subsequent to the year 1852, no entries under warrants for military services in Virginia were authorized, and subsequent to 1857 the right to make surveys on account of such warrants ceased — provision having been made by congress for the satisfaction of outstanding warrants by other means,' and that prior to the act of 1871 congress had provided no other means for the dispositions of lands remaining subject to power of disposition.
*173 But inasmuch as congress, by the act of May 27, 1880 (2d session, 46th Congress, statutes, page 142), has declared the true intent and meaning of the act of 1871 to be, that the word “ unsurveyed ” excluded lands which had been included “ in any survey ” whether valid or invalid, and as we do not deem it necessary to the decision of this case to declare the effect of the act of 1871, we leave it undecided. The decision of this question becomes unnecessary from the fact, that congress, in section 4 of the act of 1880, provides: “ This act shall not in any way affect or interfere with the title to any land sold for a valuable consideration by the Ohio Agricultural and Mechanical College, grantee, under the act of February 18, 1871.”
This section we construe to be a ratification on the part of congress of the title of Flagg, plaintiff below, who was a purchaser from the college for a valuable consideration. True, the language of the section was not happily selected to express such ratification, but we think, such was the intention of the section. Construed literally, the section can have no effect whatever. Of course, the declaratory act of 1880 could not “ affect or interfere ” with any right acquired under the act of 1871. Congress knew that the Ohio Agricultural and Mechanical College had assumed to convey title to portions of these lands for a valuable consideration, under the belief and claim that it had a right to do so under the act of 1871. The title which the act was not to “ affect or interfere with ” was not one which in the view of congress was valid and indefeasible, but one which, under the construction placed upon the act of 1871, by the act of 1880, the college had no power to convey for want of title in itself. A title, which the college intended to sell for a valuable consideration, but by reason of the construction claimed for the act of 1871, it could not convey, was the subject of this section, and the purpose undoubtedly was. to confirm the sale so made, and give it effect according to the intention of the parties.
The title of Flagg thus ratified took effect as of the date of the conveyance, no other rights having intervened.
Several other questions have been raised and considered, which need not be reported.